Not For Publication

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                                            :
DENNIS SHUMAN,                              :
                                            :        Civil Action No. 14-3658 (FLW)(LHG)
                    Plaintiff,              :
                                            :        **OPINION**
      v.                                     :
                                            :
RARITAN TOWNSHIP, RARITAN                    :
TOWNSHIP POLICE DEPARTMENT,                  :
POLICE OFFICER AAORN ROTH #57,              :
POLICE OFFICER D.S. CARSON #48,             :
POLICE OFFICER NICKLAS BUCK #27,            :
POLICE OFFICER SCOTT LESSIG,                :
POLICE CHIEF GLENN TABASKO,                 :
OFFICER ROBERT GODOWN, OFFICER              :
L. CEVASCO, JOHN DOES 1-5 and ABC           :
entities 1-5 (as yet unknown and            :
unidentified jail officials, supervisors,   :
agents or employees or entities,            :
:                       Defendants.         :
_____ :

**Hon. Freda L. Wolfson, U.S.D.J.:**

Plaintiff Dennis Shuman ("Plaintiff" or "Shuman") initiated this action against defendants

Raritan Township, Raritan Township Police Department, Police Officer D.S. Carson,

Police Officer Aaron Roth, Lieutenant Nicklas Buck, Sergeant Scott Lessig, and Police Chief

Glenn Tabasko (collectively, the "Raritan Defendants"), as well as Police Officer Robert

Godown (collectively, with the Raritan Defendants, "Defendants"), for violations of 42 U.S.C. §

1983 arising out of Plaintiff's arrest for a disorderly persons offense in violation of N.J.S.A.

2C:29–1, following his alleged interference with a traffic stop in Raritan Township, New Jersey,

early on the morning of August 5, 2012, at approximately 1:30 a.m. Plaintiff alleges that several

police officers on duty that night used excessive force in effecting Plaintiff's arrest, and that the municipality of Raritan and the officers' supervisors failed to adequately train and supervise Officer Carson, violating Plaintiff's constitutional rights. The Complaint also includes New Jersey common law claims for assault and battery, negligence, intentional infliction of emotional distress, and abuse of process and authority; and a claim under the New Jersey Civil Rights Act ("NJCRA"). Presently before the Court are two motions: (1) the Raritan Defendants' motion for summary judgment on Plaintiff's 42 U.S.C. § 1983 claim, NJCRA claim, and New Jersey common law claim for infliction of emotional distress; and (2) Officer Godown's motion for summary judgment on Plaintiff's § 1983 and NJCRA claims. For the reasons that follow, the Court grants in part and denies in part the motion of the Raritan Defendants and grants the motion of Officer Godown. Plaintiff's § 1983 and NJCRA claims against Sergeant Lessig and Officer Godown are dismissed as barred by qualified immunity. Plaintiff's § 1983 and NJCRA claims on the basis of municipal liability against Raritan Township are dismissed as barred by the Supreme Court's decision in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Plaintiff's § 1983 and NJCRA claims on the basis of supervisory liability against Police Chief Tabasko, Lieutenant Buck, and Sergeant Lessig are dismissed. The Raritan Defendants' motion for summary judgment on Plaintiff's § 1983 and NJCRA claims as raised against Officer Carson is denied. The Raritan Defendants' motion for summary judgment on Plaintiff's New Jersey common law claim for intentional infliction of emotional distress is granted. Additionally, by consent of the parties, all claims against the Raritan Township Police Department, and any punitive damages claim against Raritan Township, are dismissed with prejudice.

**FACTUAL BACKGROUND & PROCEDURAL HISTORY**

This matter concerns Plaintiff's claim that the Defendant Officers of the Raritan Township and Flemington Police Departments used excessive force in effecting Plaintiff's arrest

after Plaintiff interfered with one of the Defendant Officer's routine traffic stop of Plaintiff's daughter. Before recounting the events of the arrest itself, it is helpful to understand the history of Plaintiff's family's interaction with the Raritan Township and Flemington Police Departments. Between June and August 2012, the Plaintiff's daughter, Alexa Shuman, was stopped for various traffic violations on four occasions by Defendant Officers Roth and Carson. Roth Tr. 68:4-68:18. On June 11, 2012, Alexa Shuman was stopped by Officer Carson for crossing over the fog line with her passenger side tires. Exhibit C, Incident Report, p. 60. Officer Roth was on the scene to assist. Roth Tr. 75:10-76:2. Alexa Shuman, who was traveling with two passengers, consented to a search and Officer Carson found a cigar with marijuana in it in Alexa's possession and cocaine in the backpack of one of Alexa Shuman's passengers. Exhibit C, Incident Report, 6/11/12. Alexa Shuman was charged with possession and for the traffic offense. The drug charges were dismissed and Alexa Shuman paid a fine and pled guilty to the traffic infraction. Exhibit U.

Alexa Shuman was stopped by Officer Carson again on June 16, 2016, for having an air freshener on her rearview mirror. Officer Roth again was on scene to assist. Alexa Shuman again consented to a search and was found in possession of an empty plastic baggie. She was charged with possession of drug paraphernalia and the traffic offense. The drug charge was dismissed and Alexa Shuman again pled guilty to the traffic charge. Exhibit C; Roth Tr. 79:2-79:17.

On August 4, 2012, Alex Shuman was stopped by Officer Roth for touching or crossing a white line. Alexa Shuman refused a search and was let go. Roth Tr. 89-91.

The fourth stop, which is the subject of this case, took place shortly thereafter, early in the morning of August 5, 2012, at approximately 1:26 a.m. Officer Carson stopped Alexa Shuman, who was driving northbound on Route 202/Route 31, for entering a jug handle without the use of a turn signal. Raritan

3

Defendants' Statement of Facts, ¶ 1. Alexa Shuman pulled her car into the northbound shoulder and Officer Carson parked his vehicle immediately behind her, leaving a few feet between the two vehicles.  At approximately 1:28 a.m., Officer Carson exited his patrol car and walked to the open driver side window of Alexa Shuman's vehicle. Mobile Video Recording ("MVR") at timestamp 1:28:00.[1]

As he was standing next to Alexa Shuman's vehicle, Officer Carson overheard Alexa Shuman speaking to a male on her Bluetooth. Raritan Statement, ¶ 4. Officer Carson stood next to Alexa Shuman's open driver side window for roughly one minute, as a voice, which is clearly audible in the MVR and recognizable as that of Plaintiff Dennis Shuman, had a conversation with Alexa Shuman. MVR at 1:28:28. At 1:29 a.m., Officer Carson walked back to his patrol car. MVR at 1:29:13. At 1:30 a.m., a dark colored sedan pulled into the southbound shoulder of Route 202/Route 31, directly opposite Alexa Shuman's vehicle and Officer Carson's patrol car. MVR at 1:30:49 (while the vehicle can be seen pulling into the shoulder, it goes off screen before coming to a stop).

The parties dispute what happened next. Plaintiff contends that as he was approaching the scene of the traffic stop from his car parked across the street, the first thing he did was identify

---

[1] Much, but not all, of the incident at issue in this case was captured by a camera positioned on the dashboard of Officer Carson's patrol car. The resulting videotape is referred to by the parties as the Mobile Video Recording, or MVR. All parties concede that the MVR is the best evidence of the events depicted therein. The Court, therefore, need not make credibility determinations concerning the testimony of Defendants, as would be inappropriate on summary judgment in any case, nor will it draw inferences in Plaintiff's favor that are inconsistent with the events depicted in the videotape which captures the events giving rise to Plaintiff's excessive force claim. *See Scott v. Harris,* 550 U.S. 372, 380–81, 127 S.Ct. 1769, 1774, 167 L.Ed.2d 686 (2007) ( "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment ... [and thus,] the Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape."). Wherever possible the Court has relied upon the MVR videotape to state the facts of the case.

himself as the father of Alexa Shuman, the driver of the stopped car. Shuman Tr. 60:14-18.

Officer Carson disputes this account and claims that he did not know who Plaintiff was until

sometime after Plaintiff's arrest and was concerned for his and Alexa Shuman's safety. Raritan

Statement at ¶ 9; Carson Dep. 111:23-112:7.

The MVR did not pick up any voices during the period after Plaintiff initially exited his

sedan and began walking toward the scene of the traffic stop. The first person who can be heard

speaking after the sedan arrives is Officer Carson, who repeatedly said in a loud voice "Get back

in your car." MVR at 1:31:09. At approximately 1:31 a.m., Officer Carson told Plaintiff "Sir

you're standing in an active roadway, get back in your car or you're under arrest." MVR at

1:31:17-19. Officer Carson claims that he said this because he believed Plaintiff might be

endangering himself by standing in an active roadway in the dark. [Carson Dep. 140:2-23].

Coming into view of the MVR for the first time, Plaintiff walked in front of Officer Carson's

patrol car, in the space between it and Alexa Shuman's car, coming to a stop off screen near the

curb roughly in between the two parked vehicles. Plaintiff then said "Now I'm over on the

shoulder." MVR at 1:31:19-20.

Officer Carson again instructed Plaintiff to get back in his car or he would be placed

under arrest. Plaintiff responded by asking Officer Carson if the chief was on duty that night.

MVR at 1:31:26-27. Officer Carson did not respond, instead again ordering Plaintiff to get back

into his car and asking Plaintiff "Do you hear what I'm saying?" *Id.* at 1:31:31-32. Plaintiff

responded "I hear what you're saying. I'm calling the chief right now." *Id.* at 1:31:32-35. As

Plaintiff was saying this, he reappears in the MVR footage moving away from the curb, back

toward the middle of the road, again walking in front of Officer Carson's patrol car and behind

Alexa Shuman's car. *Id.* Plaintiff can be seen dialing his phone. In walking back toward the

middle of the street, Plaintiff passed directly in front of Officer Carson, who was standing near

the right front headlight of his patrol car. As Plaintiff walked past him, Officer Carson turned and followed closely behind Plaintiff, in a parallel path closer to his patrol car. *Id.* From this point, the incident, as recorded by the MVR, transpired very quickly.

At 1:31:36 a.m., Officer Carson, still following behind Plaintiff, again instructed Plaintiff to get back into his car.

At 1:31:37 a.m., still walking away from Officer Carson, Plaintiff can be heard to say "Okay."  Over the next two seconds, from 1:31:38 a.m. to 1:31:39 a.m. however, Plaintiff stopped walking, turned his upper body toward Officer Carson, who was following about a foot behind, and said "You are harassing my daughter." Plaintiff then turned his upper body back in the direction of the middle of the street and away from Officer Carson. Plaintiff began moving forward, back toward Plaintiff's car parked across the street.

By 1:31:40 a.m., just one second after having said "You are harassing my daughter" Plaintiff had walked out of the view of the MVR in the direction of Plaintiff's car. Officer Carson is still visible on the MVR and, less than a second after Plaintiff moved off screen, can be seen to lunge in the direction that Plaintiff moved while reaching for the handcuffs still visible on his belt. Officer Carson also then passes out of view of the MVR.

At 1:31:41 a.m., Officer Carson can be heard to say "You're under arrest."[2]

---

[2] In his deposition, before being shown the MVR by Plaintiff's counsel, Officer Carson initially provided an account of the incident that was inconsistent with the MVR. The Raritan Defendants repeated this account in their Statement of Facts when outlining Officer Carson's recollection of the incident. *Id.* at 12 ("Officer Carson stated Mr. Shuman was under arrest. After being told he was under arrest, Mr. Shuman started to move away. Officer Carson was able to handcuff his left wrist, but Mr. Shuman pulled away after being handcuffed, which now required Officer Carson to use force to arrest him."). *Accord* Carson Tr. 121:9-14 and 237:25-238:7.

At 1:31:42-43 a.m., Officer Carson and Plaintiff move back into the field of view of the MVR. Carson, standing behind Plaintiff's left shoulder and holding onto Plaintiff's left arm, throws Plaintiff onto the hood of the patrol car.

At 1:31:45 a.m. Plaintiff, still face down on the hood, said "Whoa, whoa, whoa, easy there."

Seconds later, from 1:31:46-47 a.m., Carson wrapped his right arm around Plaintiff's throat in a chokehold and pulled Plaintiff backward, off the hood of the patrol car in the direction of Alexa Shuman's vehicle.

At this moment, Alexa Shuman exited the driver side of her vehicle and said "Get off him!" in a loud voice.

At 1:31:48 a.m., Officer Carson, still holding Plaintiff in a chokehold, forced Plaintiff back onto the hood of the patrol car.

Over the next second and a half from 1:31:48 a.m. to 1:31:49 a.m., Carson pulled Plaintiff backward off of the hood, and down to the ground. Plaintiff at this point was still facing up, toward the sky, with Officer Carson performing a chokehold behind him. Plaintiff's leg can been seen flailing upward as Officer Carson and Plaintiff fell backward out of the field of view of the MVR, toward the curb near the front right headlight of the patrol car. After this point, Officer Carson and Plaintiff are outside the view of the MVR, but can still be heard on its audio recording. Alexa Shuman remains visible, standing next to the open driver side door of her car.

At 1:31:56 a.m. Plaintiff said "I'm not resisting." At this moment Officer Carson briefly reappears in the MVR footage as he gestures toward Alexa Shuman, instructing her to stay back. Officer Carson then again moves off screen. From 1:32:01-04 a.m., Officer Carson can be heard instructing Plaintiff to get on the ground and to get onto his stomach. From 1:32:04-07 a.m.,

Plaintiff repeatedly said "I'm not resisting, I'm not resisting, you're hurting me." At 1:32:10-11 a.m., Officer Carson instructed Plaintiff to "Put your hands behind your back." At 1:32:13-14 a.m., Plaintiff responded "I will do it, just stop and let me."

From 1:32:17-21 a.m., there is a period of indecipherable yelling by several voices. Less than a second later, Alexa Shuman, who is visible on the MVR looking off screen in the direction of Officer Carson and Plaintiff asked in a loud voice what "are you doing to my dad." It is unclear whether Alexa Shuman was referring to a singular or plural "you." From this point there is a period where sounds of a struggle can be heard on the MVR, but no voices are identifiable.

From 1:32:34-38 a.m., one or more officers can be heard shouting "stop resisting" multiple times. Defendant Officer Godown can be seen on the MVR arriving on the scene in his patrol car at 1:32:41 a.m.

Although not captured by the MVR, it is clear from the other evidence in the record that it is around this point that Sergeant Lessig, one of the officers responding to the scene, arrived. Sergeant Lessig testified that he arrived after Plaintiff was already lying face down on the ground and had been handcuffed by Officer Carson. Lessig Tr. 358:6-22; 365:3-6. Sergeant Lessig also testified that Officer Godown was already on the scene assisting Officer Carson to restrain Plaintiff on the ground when he arrived. *Id.* Officer Godown testified to seeing Sergeant Lessig at the scene either when or shortly after he arrived. Godown Tr. 69:23-70:1. It is undisputed that Plaintiff was handcuffed at some point after Officer Carson and Plaintiff fell out of the view of the MVR at 1:31:49 a.m., and Officer Godown arrived at 1:32:41 a.m. Sergeant Lessig thus arrived sometime at or after 1:31:49 a.m. at the earliest.[3]

---

[3] There is a potential dispute of fact as to whether Sergeant Lessig or Officer Godown was first on the scene, but any such dispute is immaterial to the present motions.

Upon arriving at the scene, Officer Godown retrieved his flashlight from his patrol car, which he parked across the street from Alexa Shuman's vehicle, and ran in the direction of Officer Carson and Plaintiff. At 1:32:47 a.m., Officer Carson can be heard saying "I don't even know who he is." Officer Godown moved toward the area where Officer Carson and Plaintiff were lying on the ground and ceases to be visible on the MVR at 1:32:48 a.m.

At 1:32:58 a.m., Officer Carson returned to the field of view of the MVR alone and told Alexa to get back into her car. Alexa complied and returned to the driver seat of her vehicle. Officer Carson remains visible on the MVR standing by himself between Alexa Shuman's vehicle and his patrol car for the duration of the incident. From the undisputed testimony of Officer Godown and Sergeant Lessig, it is clear that at the time that Officer Carson stood up and moved away from Plaintiff, Officer Godown and Sergeant Lessig were both on the ground with Plaintiff, holding Plaintiff down. Lessig Tr. 360:11-19; 316:11-21; Godown Tr. 72:11-73:4.

At 1:32:59 a.m., Plaintiff for the first time can be heard to say "I can't breathe." Again, at this point Officer Carson is visible on the MVR standing with hands visible and Alexa Shuman can be seen in her vehicle. Officer Lessig, Officer Godown, and Plaintiff are not visible on the MVR. At 1:33:02-03 a.m., Officer Godown can be heard to say "Yes you can." At 1:33:03 a.m., Plaintiff again stated he could not breathe. At 1:33:04 a.m., Officer Godown responded "knock it off." 1:33:08 a.m., Plaintiff asked "please get off my back." At 1:33:08-09 a.m., an unidentifiable voice said "no." At 1:33:09-10 a.m., Plaintiff again said "please get off my back." At 1:33:10-11 a.m., Sergeant Lessig can be heard to say "nobody's getting off your back." At 1:33:20-21 a.m., Plaintiff again said "Will you get off my back? I can't breathe." At 1:33:21 a.m., Sergeant Lessig told Plaintiff to calm down. At 1:33:26-30 a.m., Officer Godown said "If you keep moving you're going to get sprayed and then you're not going to be able to breathe, you got it, so stop moving." At 1:33:31-34 a.m., Officer Godown again instructed Plaintiff to stop moving,

indicating that "no one is on your back." At 1:33:35 a.m., Officer Godown said "We're on your arms, so stop moving." At 1:33:37 a.m., Plaintiff said "No, you're not." From 1:33:46-52 a.m., Plaintiff repeatedly stated that he could not breathe. At 1:33:52 a.m., Officer Godown again said that no one was on Plaintiff.

At 1:34:05-06 a.m., Officer Carson, still visible standing in view of the MVR, again told the other officers that he did not know who Plaintiff was or what he was doing at the site of the traffic stop. At 1:34:09 a.m., Plaintiff stated "I'm her father." At 1:34:12 a.m., Plaintiff said "Please get off me." At 1:34:14-16 a.m., Plaintiff said "Let me roll over." At 1:34:18-19 a.m., Sergeant Lessig told Plaintiff to roll over and calm down. At 1:34:20-21 a.m., Sergeant Lessig told Plaintiff to sit up. At 1:34:24-25 a.m., Sergeant Lessig told Plaintiff to sit up and "act like a human being." At the same time, Plaintiff can be heard saying that he can see his glasses, which were dislodged during the takedown and handcuffing, in some area near him. At 1:34:27 a.m., Officer Godown returns into view of the MVR, standing up and moving away from Plaintiff. He does not move toward Plaintiff again for the remainder of the recording.

At 1:34:32 a.m., Officer Carson told the other officers that he had hit Plaintiff's head against the curb "pretty good." At 1:34:50 a.m., Plaintiff asked the officers if they knew what police brutality was. At 1:35:00-03 a.m., Plaintiff in a noticeably calmer voice, stated "I literally couldn't breathe. You guys were hurting me." At 1:36:59 a.m., Plaintiff for the first time since falling backward with Officer Carson, again briefly becomes visible on the MVR. He is standing up near the right side of Officer Carson's patrol car and blood is running down his face. Plaintiff is visible for a few seconds and then goes off screen again.

At 1:37:32-33 a.m., Plaintiff asked "could you loosen these cuffs please officer?" It is not clear to whom Plaintiff was speaking. At 1:37:34 a.m., an unidentifiable voice stated "absolutely not." At 1:38:40-41 a.m., Plaintiff asked Sergeant Lessig if he could loosen Plaintiff's handcuffs.

10

MVR at 1:38:40-41 ("Sergeant could you please ease up on these handcuffs?"). At 1:38:41-42 a.m., Sergeant Lessig told Plaintiff to be patient as the officer would handle one thing at a time. At 1:38:43-44 a.m., Plaintiff responded that the handcuffs were really hurting him. MVR at 1:38:43-44 ("They're really hurting me."). At 1:38:45-50 a.m., Sergeant Lessig stated that Plaintiff had also requested that the officers retrieve his glasses and that the officers would take a look at Plaintiff's handcuffs once they had retrieved and returned his glasses to him. Plaintiff said "okay" while Sergeant Lessig was talking. At 1:39:01-02 a.m., Plaintiff stated that he had something in his eye and blood running down his face and wanted the use of his hands to wipe his face. Sergeant Lessig again responded by asking Plaintiff to be patient.

At 1:39:10-13 a.m., Officer Carson told Sergeant Lessig that, in Officer Carson's opinion, Plaintiff needed to go to the hospital due to Officer Carson having hit Plaintiff's head against the curb hard. As soon as Officer Carson finished speaking, Plaintiff said "I'm not going to the hospital."

Over the next roughly ten minutes, Plaintiff can be heard speaking to Sergeant Lessig, recounting his version of the events with Officer Carson that had just transpired. During this conversation, Plaintiff complained once more that his left handcuff was really tight, and Sergeant Lessig stated that he had checked Plaintiff's handcuffs himself. The MVR tape stops at 1:48:39 a.m. The MVR tape begins again at 2:07:19 a.m., at which point the patrol car, containing Plaintiff left for the Hunterdon Medical Center.

As a result of the incident, Plaintiff suffered injuries requiring medical attention. Plaintiff has submitted reports from James Michael Cochran, M.D., Ph.D., and Warren M. Klein, M.D., indicating that Plaintiff suffered a fracture of the distal medial epicondyle (left elbow), tear of the radial collateral ligament of the left forearm, nine retinal tears of the left eye (which required surgical correction), posterior vitreous detachment of the left eye (a detached retina), left

occipital neuralgia (head pain), and left superficial radial neuropathy (nerve damage to the left wrist).

Plaintiff received a two count summons as a result of the incident, charging him with two disorderly persons offenses: resisting arrest and obstruction of justice. Plaintiff pled guilty to the obstruction of justice charge on August 21, 2013, and the resisting arrest charge was dismissed. Shuman Tr. 106-110.

On June 6, 2014, Plaintiff filed a complaint against the Raritan Defendants, seeking recovery under 42 U.S.C. § 1983, and New Jersey state law causes of action. On February 19, 2015, Plaintiff filed an amended complaint naming Officer Godown and Officer Lauren Cevasco of the Flemington Borough Police Department as additional defendants. On April 27, 2015, during a telephonic case management conference before the Honorable Lois H. Goodman, U.S.M.J., Plaintiff stipulated to the dismissal of the state law causes of action against Officers Godown and Cevasco, except for Plaintiff's claim under the New Jersey State Constitution. After deposing Officers Godown and Cevasco, Plaintiff further stipulated to the dismissal of Officer Cevasco as a defendant.

On April 22, 2016, the Raritan Defendants moved for summary judgment. The Raritan Defendants' motion seeks (i) to dismiss all claims against the Raritan Township Police Department as an improperly named party; (ii) to dismiss all 42 U.S.C. § 1983 and NJCRA claims against all Raritan Defendants on the basis of false arrest and false imprisonment or malicious prosecution for failure to state a claim; (iii) a grant of summary judgment in favor of Defendants Officer Carson and Sergeant Lessig on the merits of Plaintiff's § 1983 excessive force claim and NJCRA claim; (iv) a grant of summary judgment on Plaintiff's § 1983 excessive force claim and NJCRA claim in favor of Defendants Officer Carson and Sergeant Lessig on the basis of qualified immunity; (v) a grant of summary judgment in favor of Defendants Raritan

Township, Police Chief Tabasko, Lieutenant Buck, and Sergeant Lessig on all of Plaintiff's municipal and supervisory liability claims on the basis of the Supreme Court's holding in *Monnell*; (vi) a grant of summary judgment in favor of all of the Raritan Defendants on the merits of Plaintiff's New Jersey state intentional infliction of emotional distress claim; and (vii) to dismiss all punitive damages claims against Defendant Raritan Township as precluded by law.

On April 28, 2016, Defendant Officer Godown moved for summary judgment on Plaintiff's claims under 42 U.S.C. § 1983 and the New Jersey State Constitution on the merits and on the basis of qualified immunity.

**STANDARD OF REVIEW**

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." *Fed. R. Civ. P.* 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. County of Bucks,* 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson,* 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor .'" *Marino v. Indus. Crating Co.,* 358 F.3d 241, 247 (3d Cir. 2004) (*quoting Anderson,* 447 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Curley v. Klem,* 298 F.3d 271, 276–77 (3d Cir. 2002).

In *Scott v. Harris,* 550 U.S. 372, 378, 127 S.Ct. 1769, 1774, 167 L.Ed.2d 686 (2007), the Supreme Court noted that the existence in the record of a videotape capturing the events underlying an excessive force claim presents an "added wrinkle" to the usual standard which requires courts "to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.' " (Citations omitted). As previously noted, the Court instructed that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." *Scott,* 550 U.S. at 380. Under such circumstances, the Supreme Court held, a court should view "the facts in the light depicted by the videotape ." *Id.* at 380–81.

The burden of establishing that no "genuine issue" exists is on the party moving for summary judgment. *Celotex,* 477 U.S. at 330. "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." *Gleason v. Norwest Mortg., Inc.,* 243 F.3d 130, 138 (3d Cir. 2001). The non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." *Woloszyn v. County of Lawrence,* 396 F.3d 314, 319 (3d Cir. 2005) (quotations omitted). Under *Anderson,* Plaintiffs' proffered evidence must be sufficient to meet the substantive evidentiary standard the jury would have to use at trial. 477 U.S. at 255. To do so, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324 (quotations omitted); *see also Matsushita,* 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley,* 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.

*Anderson,* 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322–23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.,* 972 F.2d 53, 55 (3d Cir.1992).

## ANALYSIS

### I. Matters Not in Dispute

As an initial matter, the Raritan Defendants move for summary judgment on a number of bases that Plaintiff does not oppose. Firstly, Plaintiff concedes that he is precluded from raising § 1983 claims predicated on false arrest and malicious prosecution causes of action as a result of Plaintiff's guilty plea to obstruction of justice under N.J.S.A. 2C:29-1A. The Court observes that it does not appear that Plaintiff in fact raised a § 1983 claim on either of these bases, as Plaintiff's § 1983 claim, as articulated in the Complaint, appears to be based only on the violation of the Fourth Amendment through the use of excessive force during Plaintiff's arrest. Still, to the extent any claims in the Complaint were intended to be raised on the basis of false arrest or malicious prosecution, they are dismissed.[4]

---

[4] The Court strongly disapproves of the use of form or recycled briefing, particularly in the fact-sensitive area of Fourth Amendment claims and qualified immunity. The Raritan Defendants' motion for judgment on bases not raised in Plaintiff's Complaint is disconcerting, as is defense counsel's reference to the municipal actor at issue in its argument against *Monell* liability as "the Township of Edison," not the Defendant Township of Raritan actually named in this case. *See* Raritan Defendants' Moving Brief at 22.

Secondly, Plaintiff concedes that the Raritan Township Police Department is not a separate entity from Raritan Township for the purposes of Plaintiff's claims, and, thus, was not properly named as a separate defendant. Plaintiff agrees to dismiss the Complaint as against the Police Department; the Police Department is dismissed as a party.

Third and finally, Plaintiff also concedes that punitive damages cannot be assessed against the municipality, Raritan Township, and agrees to the dismissal of such claims against the Township only, and not against the individual, police officer defendants. Plaintiff's claim for punitive damages against Raritan Township is dismissed.

With the foregoing issues resolved, the remaining matters before the Court are (1) Defendants' motions for summary judgment as to the excessive force claims raised against Officer Carson, Sergeant Lessig, and Officer Godown, on the merits and on the basis of qualified immunity; (2) the Raritan Defendants' motion for summary judgment as to the *Monell* liability claims raised against Raritan Township, Police Chief Glenn Tabasko, Lieutenant Buck[5], and Sergeant Lessig; and (3) the Raritan Defendants' motion for summary judgment as to Plaintiff's New Jersey State law claim for negligent infliction of emotional distress.

---

[5] In their motion, the Raritan Defendants, without explanation, refer to Plaintiff's claims as raised against Lieutenant Donovan, the officer who conducted the internal affairs investigation into Officer Carson's use of force in Plaintiff's case, not Lieutenant Buck, the officer who conducted at least one of the prior internal affairs investigations into Officer Carson and who is named as a defendant in the Complaint. Plaintiff adopts the use of "Lieutenant Donovan" in his opposition as well, but no motion to amend the Complaint to name Lieutenant Donovan as a defendant has been made, nor has a stipulation been entered dismissing Lieutenant Buck as a party to this action. In the absence of any action by the parties, this Court will interpret Defendants' motion for summary judgment on the basis of supervisory liability as in favor of the named defendant supervisors: Tabasko, Buck, and Lessig. As "Lieutenant Donovan" is not a named defendant, no motion in his favor is appropriate at this time.

The Court also notes that the Raritan Defendants' motion cannot be fairly read to move for summary judgment on behalf of Police Officer Aaron Roth on the same bases as the defendants actually named in Defendants' moving papers, and none of the parties have briefed the issues of qualified immunity or the merits of Plaintiff's excessive force claim as raised against Roth. The Court observes, without deciding, that no factual allegations of excessive force or supervisory liability have been raised against Officer Roth, and that dismissal or judgment as a matter of law in his favor might be warranted. The Court, nevertheless, cannot raise this matter *sua sponte* on the basis of the motions before it, without giving Plaintiff an opportunity to oppose any motion on behalf of Officer Roth. The Raritan Defendants do, however, move for summary judgment on Plaintiff's claim for intentional infliction of emotional distress on legal grounds, which the Court will interpret as in favor of all Raritan Defendants, including Officer Roth.

## II. Qualified Immunity:

"Police officers, embodying the authority of the state, are liable under § 1983 when they violate someone's constitutional rights, unless they are protected by qualified immunity." *Santini v. Fuentes*, 795 F.3d 410, 416–17 (3d Cir. 2015) (quoting *Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007). "The doctrine of qualified immunity shields government officials who perform discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* at 417 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). "The purpose of qualified immunity is to 'avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.' *Id.*

An "essential attribute [of absolute and qualified immunity is] an entitlement not to stand trial under certain circumstances," and qualified immunity is "an *immunity from suit* rather than a mere defense to liability." *In re Mushroom Direct Purchaser Antitrust Litig.*, 655 F.3d 158, 164

(3d Cir. 2011) (quoting 472 U.S. at 525–26) (alterations in original). Because the individual defendants in this case are police officers, the Court must therefore consider whether the Defendants are entitled to summary judgment on Plaintiff's claims under the protection afforded by qualified immunity, before proceeding to consideration of the other, merits arguments in support of Defendants' motions.

Courts in the Third Circuit perform a two-step inquiry to determine whether a particular government official is entitled to summary judgment based on qualified immunity. "First, we ask whether the facts—taken in the light most favorable to the nonmoving party—show that a government official violated a constitutional right." *Santini*, 795 F.3d at 417 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Second, we ask whether that right was clearly established at the time of the official's actions. *Id.* This two-step process "has more particularized requirements in an excessive force case such as this one." *Id.*

In excessive force cases, courts in the Third Circuit determine whether a constitutional violation has occurred using the Fourth Amendment's objective reasonableness test as set forth in *Graham v. Connor*, 490 U.S. 386, 395 (1989). *See Curley*, 499 F.3d at 206–07. To determine objective reasonableness, courts must balance the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)) (internal quotation marks omitted). While this inquiry is "highly individualized and fact specific," the Supreme Court has provided three factors to guide courts:

> (1) the severity of the crime at issue,
> (2) whether the suspect poses an imminent threat to the safety of the police or others in the vicinity, and
> (3) whether the suspect attempts to resist arrest or flee the scene.

*Santini*, 795 F.3d at 417 (quoting *Graham,* 490 U.S. at 396). *See also Sharrar v. Felsing,* 128 F.3d 810, 822 (3d Cir. 1997) (providing additional factors including "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time").

Furthermore, "objective reasonableness" is evaluated "from the perspective of the officer at the time of the incident and not with the benefit of hindsight." *Santini*, 795 F.3d at 417 (citing *Maryland v. Garrison,* 480 U.S. 79, 85 (1987)). The Third Circuit has summarized this standard, evaluating all of the *Graham* factors and additional *Sharrar* considerations, as employing a "totality of the circumstances" approach for evaluating objective reasonableness. *Id.* (citing *Curley,* 499 F.3d at 207).

During the second step of the qualified immunity inquiry, courts ask whether "even though an officer violated an individual's constitutional right—immunity should still protect that officer from liability." *Id.* To answer that question, courts must determine "whether the right violated by the officer was clearly established at the time of the violation." *Id.* (citing *Saucier,* 533 U.S. at 202). To make that determination, courts engage in another reasonableness inquiry: "'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *Saucier,* 533 U.S. at 202). "Like the reasonableness inquiry conducted in step one, this inquiry is objective and fact specific." *Id.* "[T]he step two inquiry is distinct from the inquiry conducted in step one." *Id.* at 418 (citing *Saucier*, 533 U.S. at 205). "*Saucier* highlighted this distinction by noting that the purpose of the step two inquiry is to acknowledge the reality that 'reasonable mistakes can be made as to the legal constraints on

particular police conduct.'" *Id.*[6] (quoting *Curley,* 499 F.3d at 207). As the Third Circuit concluded

in *Curley*:

> [T]he first step of the analysis addresses whether the force used by the officer was
> excessive, and therefore violative of the plaintiff's constitutional rights, or whether it was
> reasonable in light of the facts and circumstances available to the officer at the time. This
> is not a question of immunity at all, but is instead the underlying question of whether
> there is even a wrong to be addressed in an analysis of immunity. The second step is the
> immunity analysis and addresses whether, if there was a wrong, such as the use of
> excessive force, the officer made a reasonable mistake about the legal constraints on his
> actions and should ... be protected against suit[.]

*Curley,* 499 F.3d at 207.[7] Applying these principles, the Court evaluates the qualified immunity

of each of three individual defendant officers alleged to have used excessive force against

Plaintiff.

## A. Officer Carson

## 1. Step One

At the most basic level, "[t]o state a claim for excessive force as an unreasonable seizure

under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred" *Kopec v. Tate*, 361

F.3d 772, 776 (3d Cir. 2004) (quoting *Estate of Smith v. Marasco,* 318 F.3d 497, 515 (3d Cir.

---

[6] *See Santini v. Fuentes*, 795 F.3d 410, 418 (3d Cir. 2015) ("*Saucier* mandated that its two-step inquiry be performed in sequential order, *Saucier,* 533 U.S. at 201, which created 'perplexing logical and practical' issues for the lower courts, *Curley,* 499 F.3d at 208. The Supreme Court remedied those issues in *Pearson v. Callahan,* 555 U.S. 223, 236 (2009). After Pearson, district and appellate courts have discretion to perform the *Saucier* inquiry in the order we deem most appropriate for the particular case before us.").

[7] The Third Circuit has also cautioned that "'reasonableness under the Fourth Amendment should frequently remain a question for the jury,' however, 'defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances," as evaluated under the standard set forth above. *Kopec,* 361 F.3d at 777 (quoting *Abraham v. Raso,* 183 F.3d 279, 290 (3d Cir. 1999) (internal citations omitted).

2003)). Here, the parties do not dispute that Plaintiff's arrest by Officer Carson on August 5, 2012, was a "seizure" of his person within the meaning of the Fourth Amendment, and so the only issue in the first step of the qualified immunity analysis is whether Officer Carson violated Plaintiff's constitutional rights by using force to effect that seizure that was not objectively reasonable.

Plaintiff alleges three distinct uses of force by Officer Carson violated Plaintiff's Fourth Amendment rights. First, Plaintiff alleges that Officer Carson's takedown of Plaintiff -- first throwing him against the hood of Officer Carson's patrol car, then placing Plaintiff in a headlock, sweeping Plaintiff's legs from under him and throwing him to the ground, in the process causing Plaintiff's head to impact the curb – involved excessive force and resulted in injury to the Plaintiff. Second, Plaintiff alleges that in the process of handcuffing Plaintiff, Officer Carson forcefully pulled on Plaintiff's arm, forcing it beyond Plaintiff's natural range of motion and in the process tearing the tendons in Plaintiff's arm and chipping Plaintiff's elbow. Shuman Tr. 71:21-25; 72:1-8. Third and finally, Plaintiff contends that Officer Carson applied the handcuffs to Plaintiff too tightly, causing permanent nerve damage to Plaintiff's wrist.

###### (i)        Seriousness of the Crime

The Court begins by looking to the first *Graham* factor, the seriousness of the crime at issue, which is the same for all three alleged acts. Here, the language used in the first *Graham* factor is somewhat of a misnomer, because the Obstruction of the Administration of Law or Other Governmental Function charge to which Plaintiff pled guilty was a disorderly persons offense, not a crime. *See* N.J.S.A. 2C:29-1 ("An offense under this section is a crime of the fourth degree if the actor obstructs the detection or investigation of a crime or the prosecution of a person for a crime, otherwise it is a disorderly persons offense."). The specific conduct

underlying the plea was Plaintiff's approach toward Officer Carson while Officer Carson's traffic stop of Alexa Shuman was in process and of speaking to Officer Carson while Officer Carson was attempting to conclude the stop and issue Alexa Shuman a ticket. Raritan Twp. Mun. Ct., March 7, 2013 Plea Tr. 4:16-22 (THE COURT: "Now, Mr. Shuman, how do you plead to the charge, of Count 1 in the complaint . . . by physical interference, specifically entering a public street and interfering with a traffic stop." MR. SHUMAN: "Guilty, Your Honor."). *See also id.* at 7:9-13 (MR. LEMBER (Plaintiff's counsel): "You acknowledge that by going there and addressing him and talking to him, you were in effect, interfering with his investigation, is that correct?" MR. SHUMAN: "Yes."). This conduct, while constituting a violation of the law as evidenced by Plaintiff's guilty plea, was not so severe as to warrant the use of physical force employed by Officer Carson in the takedown and handcuffing.

  (ii)  **Threat to Safety: Takedown**

  Moving on the second *Graham* factor, the Court finds that Plaintiff did not pose an imminent threat to the safety of Officer Carson, himself, or Alexa Shuman – the only other person in the vicinity – at the time of the takedown initiating Plaintiff's arrest. The undisputed facts, as evidenced by the MVR, are that Officer Carson observed Plaintiff parking his vehicle and walking across the street toward Officer Carson and the parked vehicle of Alexa Shuman. The Raritan Defendants argue extensively in briefing that Officer Carson was concerned for Plaintiff's safety as Plaintiff was crossing the roadway, because the roadway was still open to through traffic. In the MVR, Officer Carson can be heard to instruct Plaintiff to get out of the roadway, and Plaintiff can be seen to walk in front of Officer Carson's patrol car to the curb side of the street, at which point Plaintiff continues speaking to Officer Carson. Officer Carson repeatedly instructs Plaintiff to return to his vehicle. Plaintiff at first attempts to continue speaking with Officer Carson, but is then seen complying with Officer Carson's command and

walking back in front of Officer Carson's patrol car toward Plaintiff's vehicle parked across the street. Having reached the street side corner of Officer Carson's patrol car, Plaintiff partially turns while holding his cellular phone to his ear with one hand and states that Officer Carson is harassing his daughter and the Plaintiff will be calling the police chief. Plaintiff then turns back toward Plaintiff's car across the street and continues moving in the direction of Plaintiff's vehicle (away from Officer Carson and Alexa Shuman). It was at this point that Officer Carson can be seen to lunge at Plaintiff and grab Plaintiff from behind, and, one second *later*, can be heard to state that Plaintiff in under arrest. Officer Carson then, with the same motion, throws Plaintiff against the hood of his patrol car, places Plaintiff in a chokehold while pulling him backward, throws Plaintiff against the hood of the patrol car again, and then, still holding Plaintiff in a chokehold, pulls Plaintiff backward toward the curb, ultimately forcefully hitting Plaintiff's head against the curb (the impact with the curb is not visible in the MVR, but is undisputed by the parties). Accordingly, at the time Officer Carson initiated the takedown, Plaintiff was moving away from Officer Carson and Alexa Shuman, and apparently complying with Officer Carson's order to return to his vehicle. Plaintiff had not yet proceeded into the middle of the roadway where he might have been at risk of being struck by another vehicle. At the time of the takedown therefore, Plaintiff presented no threat to Officer Carson, himself, or anyone else.[8]

---

[8] The Court observes that there is a significant dispute of fact concerning the threat posed by Plaintiff to Officer Carson, which the Court need not resolve in order to rule on the present motions. Specifically, Officer Carson contended repeatedly at the scene of the incident, in his report, and at his deposition that one reason why he was concerned for his own safety and for that of Alexa Shuman during the traffic stop was that he did not know who Plaintiff was, including at the time he exercised physical force against Plaintiff. Plaintiff disagrees with Officer Carson's account, and has consistently contended, from his comments to Sergeant Lessig captured on the MVR, to his deposition, that the first thing he did upon arriving at the scene of the traffic stop was to inform Officer Carson that he was Alexa Shuman's father. Additionally, in his report, Officer Carson clearly stated that he was aware that Alexa Shuman was speaking to her father on her car's Bluetooth. Raritan Township P.D., Incident Report IN-12-00813, dated 08/05/2012. On the MVR, Plaintiff's recognizable voice can be heard over Alexa Shuman's

### (iii)    Threat to Safety: Handcuffing

Disputes of material fact remain concerning the risk posed by Plaintiff during the period in which Officer Carson pulled Plaintiff's arm while handcuffing him and allegedly applied the handcuffs in an overly tight manner while Officer Carson and Plaintiff were on the ground outside the view of the MVR. At the point that Officer Carson and Plaintiff had fallen to the ground, it was clear to Plaintiff that he was under arrest. Officer Carson had clearly told him as much shortly after he grabbed Plaintiff from behind. The dispute between the parties, therefore, is whether Plaintiff was actively resisting arrest at the time Officer Carson was attempting to handcuff him. Officer Carson contends that Plaintiff was resisting arrest. Carson Tr. 185:9-11. Plaintiff contends that he was not. Shuman Tr. 80:14-15. The MVR does not support the account of either side over the other, as Plaintiff can be heard to say repeatedly during the altercation that he was not resisting arrest, while Officer Carson can be heard to order Plaintiff to place his hands behind his back and stop moving.

### (iv)    Fleeing or Resisting Arrest: Takedown

Looking to the Third *Graham* factor, at the time of the takedown Plaintiff was not fleeing the scene or resisting arrest. Firstly, the MVR shows Plaintiff complying with Officer Carson's instruction to return to his vehicle. MVR at 1:31:40. Officer Carson ordered Plaintiff to return to his vehicle and asked Plaintiff if he understood what Officer Carson was telling him. Plaintiff stated that he understood and began walking back across the street. According to the MVR, any

---

Bluetooth. MVR at 1:28:28. The Court cannot, at this stage, however, determine which account should be credited, as that role is reserved for the jury. Nevertheless, the objective conduct captured on the MVR is sufficient to determine the threat posed by Plaintiff, even if he were unknown to Officer Carson at the time of the takedown, so the Court may continue with its qualified immunity analysis.

motion to leave the scene was thus initiated by Officer Carson's order. More importantly, Officer Carson did not inform Plaintiff he was under arrest until at or after the moment in which Officer Carson came into physical contact with Plaintiff and began exercising physical force. MVR at 1:31:41. Officer Carson's use of force in executing the takedown could therefore not possibly have been in response to any action by Plaintiff to resist arrest, because Plaintiff was unaware that he was under arrest, until he was already in the process of being thrown against the hood of the patrol vehicle.

### (v)   Fleeing or Resisting Arrest: Handcuffing

As indicated above, at the time that Plaintiff was handcuffed – when Plaintiff and Officer Carson were on the ground, there are disputes of material fact about whether Plaintiff was resisting arrest. The MVR does not capture an image of what happened while Plaintiff was on the ground, only providing audio of Plaintiff stating that he could not breathe and was being hurt and Officer Carson asking Plaintiff to put his hands behind his back and stop resisting. On the record before it, the Court cannot determine whether Plaintiff was resisting arrest at the time he was handcuffed.

### (vi)   Sharrar Factors

Turning briefly to any additional considerations, the undisputed facts show that Plaintiff was not acting in a violent or dangerous manner at the time of the takedown (he was holding a cellphone in one hand and the other was empty; he was moving away from Officer Carson and Alexa Shuman in apparent compliance with a police order), the action was very brief (Plaintiff had only been on the scene of the traffic stop for thirty seconds before he was arrested by Officer Carson, MVR 1:31:09-1:31:40), there was little possibility that Plaintiff was armed (he was holding a cellphone in one hand and the other was empty), and Officer Carson only had to deal with Plaintiff, or at most Plaintiff and Alexa Shuman at one time because Alexa Shuman was

complying with Officer Carson's order to remain in her vehicle at the time the arrest and takedown began. She later exited the vehicle as Officer Carson was handcuffing Plaintiff on the ground, but complied with Officer Carson's commands to stay back and return to her vehicle. In short, Officer Carson did not, for example, have to deal with other suspects or a crowd of the public. The additional *Sharrar* factors thus weigh against a grant of qualified immunity.

Accordingly, based on the Court's review of all of the *Graham* and *Sharrar* factors, Officer Carson's use of force in executing a takedown of Plaintiff cannot at step one be shielded by the grant of qualified immunity.

## 2. Step Two

### (i)    Takedown

Having determined that at least some of Officer Carson's conduct could constitute excessive force, the Court next considers whether Officer Carson made a reasonable mistake in applying force and thus nevertheless should be entitled to immunity. Given the facts in this case, it should have been clear to a reasonable officer in Officer Carson's position that his use of force was excessive and unreasonable and in violation of Plaintiff's clearly established rights. Officer Carson grabbed, from behind, a person who was actively complying with Officer Carson's order to return to his vehicle. The footage on the MVR confirms that Plaintiff was moving away from the officer at the time of contact, and that Officer Carson did not inform Plaintiff that he was under arrest until at or after the point at which Officer Carson made physical contact with the Plaintiff.  In these circumstances, no reasonable officer could have believed the level of force employed by Officer Carson was not excessive.

### (ii)    Handcuffing

There are disputes of material fact concerning whether any mistake in the application of force by Officer Carson in the process of handcuffing plaintiff may nevertheless have been

entitled to immunity. Firstly, as in the case of the objective reasonableness of Officer Carson's use of force, it is disputed whether Plaintiff was in fact resisting arrest at the time of handcuffing, such that Officer Carson may have reasonably perceived a threat from Plaintiff or that Plaintiff was resisting arrest. Secondly, it is unclear from the MVR whether Plaintiff ever informed Officer Carson that his handcuffs were applied too tightly. The record is clear that Sergeant Lessig was so informed, but any mistake by Officer Carson may have been reasonable if he were never made aware of the problem.

In view of the undisputed facts, and given the remaining disputes of fact, Officer Carson's motion for summary judgment on the basis of qualified immunity is denied. Concerning Officer Carson's initial takedown of Plaintiff, Officer Carson's exercise of force was objectively unreasonable and in violation of a Plaintiff's clearly established right to be free of unreasonable seizures of his person. The Raritan Defendants' motion for summary judgment on this basis is denied. Concerning Officer Carson's conduct while handcuffing Plaintiff, both as to his alleged pulling of Plaintiff's arm and as to his alleged misapplication of Plaintiff's handcuffs, disputes of material fact prevent the granting of Defendants' motion. The Raritan Defendants' motion for summary judgment on these bases is therefore denied without prejudice.

**3. Merits**

The Raritan Defendants' motion for summary judgment on the merits on the basis that Officer Carson's use of force was objectively reasonable is also denied, because, as the Court observed in its step one discussion of qualified immunity, Plaintiff has introduced enough facts that a reasonable jury could conclude that Officer Carson acted unreasonably, at least with respect to Officer Carson's initial takedown of Plaintiff.

The case of *Mierzwa v. United States*, 282 F. App'x 973 (3d Cir. 2008), upon which Defendants heavily rely in support of their merits motion, is distinguishable from the case at bar.

In *Mierzwa*, the undisputed facts showed that Plaintiff "demonstrated unprovoked animosity towards Defendants," gave defendants "reason to believe that he potentially constituted a threat to their safety," and "attempted to leave the scene and evade arrest." *Id.* at 978–79. Here, as the Court has already observed, the MVR establishes that Plaintiff, at the time of the initial takedown, was not acting aggressively toward Officer Carson, was not threatening Officer Carson's safety, and was not attempting to evade arrest.

**B. Sergeant Lessig**

Plaintiff alleges two instances of excessive force by Sergeant Lessig. First, Plaintiff alleges that Sergeant Lessig held Plaintiff down after Plaintiff had been taken down and handcuffed by Officer Carson, and that this holding down involved pinning Plaintiff's arm behind his back with Sergeant Lessig's knee. Plaintiff also alleges that this holding down may have involved Sergeant Lessig placing his knee on Plaintiff's back, making it temporarily difficult for Plaintiff to breathe.[9] Second, Plaintiff alleges that Sergeant Lessig failed to loosen or remove Plaintiff's handcuffs in a timely manner after Plaintiff informed Sergeant Lessig that Officer Carson had applied the cuffs too tightly.

**1. Step One**

As has already been set forth in the context of Officer Carson's conduct, the key factor in determining whether the use of force against Plaintiff during the period when he was on the ground was unreasonable depends upon the disputed issue of fact of whether Plaintiff was actively resisting arrest. In evaluating qualified immunity, however, courts are permitted to

---

[9] Plaintiff has stated that one of the officers restraining him on the ground placed his knee on Plaintiff's back, but cannot state with certainty which officer it was.

address the steps in either order, and in the case of Sergeant Lessig, the step two analysis proves dispositive. *Santini v. Fuentes*, 795 F.3d 410, 418 (3d Cir. 2015).

## 2. Step Two

### (i)    Restraining Plaintiff on the Ground

Sergeant Lessig testified that he arrived on the scene after Officer Carson had already placed Plaintiff face down on the ground and observed Officer Carson struggling with Plaintiff. Officer Lessig then kneeled, either on Plaintiff's bicep, as Officer Lessig testified, or on Plaintiff's back, as alleged, albeit without certainty, by Plaintiff. The parties do not dispute that Officer Lessig arrived after Plaintiff was on the ground and Officer Lessig testified to that effect. Officer Lessig did not come into contact with Plaintiff until sometime after 1:31:49 a.m., as at that moment Plaintiff was not yet handcuffed, and Officer Lessig testified that Plaintiff was already handcuffed when he came in contact with Plaintiff. MVR at 1:31:49. Plaintiff is visible in the MVR recording, standing up at 1:36:59 a.m. Therefore, at most, Officer Lessig was in contact with Plaintiff on the ground for five minutes and ten seconds. Other, uncontradicted, but nonconclusive evidence strongly suggests that the length of the contact was even shorter. At 1:34:24 a.m., Sergeant Lessig can be heard on the MVR instructing plaintiff to sit up. Plaintiff is heard shortly thereafter speaking in a calm, unstrained voice, markedly different that than used when he was restrained on the ground. Additionally Officer Godown testified that he and Sergeant Lessig released Plaintiff from his prone position on the ground, which the MVR confirms happened no later than 1:34:27 a.m., when Officer Godown is clearly visible standing up away from Plaintiff. Accordingly, the facts support that Officer Lessig was likely only in contact with Plaintiff for a little over two and a half minutes.

Reviewing the totality of the circumstances, Sergeant Lessig testified that he used limited force against plaintiff, namely holding Plaintiff down on the ground for a short period

29

immediately after he arrived on the scene. Officer Lessig testified that he did this while he was assessing the situation, to determine whether Plaintiff had been handcuffed and to evaluate whether Plaintiff posed a threat to the current officers. Lessig Tr. 361:11-363:10. On the MVR, Officer Carson can be heard telling Sergeant Lessig and Officer Godown, that he did not know who Plaintiff was or what his intentions were. MVR at 1:32:48; 1:34:05.

Accordingly, from the information available to Sergeant Lessig at the time, he was responding to a call for assistance from Officer Carson, he arrived on the scene to find Officer Carson on the ground with Plaintiff, who was admittedly moving around on the ground (although Plaintiff's motivation for moving is disputed), he was told by Officer Carson that the person on the ground was unidentified and of unknown intentions, and so Sergeant Lessig in response, held Plaintiff on the ground for two to five minutes until Plaintiff stopped moving, at which point Plaintiff was allowed to sit up. Even if whatever force Sergeant Lessig used on Plaintiff while he was restrained on the ground were excessive, its application would nevertheless be entitled to immunity based upon the information available to a reasonable officer in Sergeant Lessig's position. Given the apparent circumstances, it would not have been clear to a reasonable officer in Sergeant Lessig's position that his conduct was in violation of Plaintiff's rights.

### (ii)    Failure to Loosen Handcuffs

Courts in this District in interpreting Third Circuit precedents have distilled a number of factors relevant in determining whether a plaintiff's treatment after handcuffing constitutes the use of excessive force. "The factors include[]:

> the intensity of the plaintiff's pain, the officer's awareness of the plaintiff's pain, whether the plaintiff asked to have the handcuffs removed and how long after those requests the handcuffs are removed, whether there were circumstances justifying a delay in removing the handcuffs, and the severity of the injury the plaintiff suffered.

*Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 441 (D.N.J. 2011) (citing *Cincerella v. Egg*

*Harbor Twp. Police Dept.,* No. 06–1183, 2009 WL 792489, at *10 (D.N.J. March 23, 2009;

*Gilles v. Davis,* 427 F.3d at 207–08; and *Kopec,* 361 F.3d at 777).

In the seminal case of *Kopec*, for example, the Third Circuit found that where (i) the defendant officer had placed handcuffs on plaintiff that were excessively tight; (ii) plaintiff repeatedly requested that the handcuffs be loosened; (iii) the defendant officer took ten minutes to respond to plaintiff's requests; and (iv) as a result plaintiff suffered permanent nerve injury to his wrist, the facts, viewed in the light most favorable to plaintiff would establish the use of excessive force in violation of the Fourth Amendment. *Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004). The *Kopec* court, however, cautioned that its "opinion should not be overread as we do not intend to open the floodgates to a torrent of handcuff claims." In addressing the step-two considerations, the court observed that the defendant officer faced "rather benign circumstances that hardly justified his failure to respond more promptly." *Id.*

Turning first to step one, Plaintiff in this case has alleged that Officer Carson applied handcuffs to Plaintiff too tightly, that these handcuffs caused plaintiff severe pain, and that the overtight application of the handcuffs resulted in permanent nerve damage to Plaintiff's left wrist. Plaintiff further alleges and has supported with evidence that he told Sergeant Lessig that the handcuffs were too tight and requested that they be loosened. The MVR confirms that Plaintiff asked Sergeant Lessig to loosen the handcuffs at 1:38 a.m. In his deposition, Sergeant Lessig testified that he did eventually adjust Plaintiff's handcuffs and assess Plaintiff's injuries. Lessig Tr. 465:13-15.

"[T]he plaintiff bears *the initial burden* of showing that the defendant's conduct violated some *clearly established* statutory or constitutional right." *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 637 n.4 (3d Cir. 2015) (quoting *Sherwood v. Mulvihill,* 113 F.3d 396, 399 (3d Cir. 1997) (emphasis added in original)). Plaintiff, however, has failed to offer factual support for one

key element necessary to determine whether a failure to loosen handcuffs constitutes excessive force, namely how long Sergeant Lessig delayed in adjusting Plaintiff's handcuffs. The record is clear that Plaintiff complained that the cuffs were too tight. The record is also clear that Sergeant Lessig loosened Plaintiff's cuffs in response to these requests. Without any facts from Plaintiff suggesting the time period between Plaintiff's initial request for relief and Sergeant Lessig's granting of that request, the Court cannot find Plaintiff to have introduced facts demonstrating Sergeant Lessig's conduct to have been objectively unreasonable.

Turning to step two, it is clear that at least for a certain period of time after Plaintiff requested that the cuffs be loosened, Sergeant Lessig was engaged in other activity justifying delay. The MVR captures an audio recording of Plaintiff requesting that Sergeant Lessig loosen his cuffs, and Sergeant Lessig explaining to Plaintiff that, as Plaintiff had stated that he could not see without his glasses, Sergeant Lessig was going to retrieve Plaintiff's glasses and return them to him first before looking at Plaintiff's cuffs. MVR at 1:34:24-25. The Court does not need to resolve step two, but Plaintiff similarly has not introduced facts that support that Sergeant Lessig should have been aware that his conduct violated some clearly established constitutional right by showing that there were no reasonable justifications for his delay.

**C. Officer Godown**

**1. Step One**

Tellingly, the evaluation of Officer Godown's entitlement to qualified immunity is difficult in this case because it is not clear precisely how Officer Godown is alleged to have acted with excessive force. It is undisputed that Officer Godown's interaction with Plaintiff was very brief, taking place over approximately a minute and a half.  MVR 1:32:52-1:34:27. Further, it is undisputed that Officer Godown arrived at the scene in his patrol car and witnessed Plaintiff moving on the ground while being restrained by Officer Carson and possibly also Sergeant

Lessig. Plaintiff contends that he was "wiggling" around on the ground due to pain and the

inability to breathe. Shuman Tr. 87:5-8. Officer Godown testified in his deposition that Plaintiff

was "combative" and was lifting up his head and trying to turn over onto his side and stand up.

Godown Tr. 69:2372:14. What Plaintiff contends were merely pained motions attempting to

regain his breath, were thus signs of struggle from the perspective of Officer Godown.

Nevertheless, construing the facts in the light most favorable to Plaintiff, there are, as in the case

of Sergeant Lessig, disputes of material fact as to whether Plaintiff was in fact resisting arrest

such that the force used against him might have been objectively unreasonable. As in the case of

Sergeant Lessig, however, the Court's step two analysis proves dispositive.[10]

**2. Step Two**

While the objective reasonableness of Officer Godown's use of force remains in dispute,

Officer Godown is nevertheless entitled to qualified immunity for his conduct in light of the

circumstances surrounding his limited use of force. Firstly, Officer Godown's use of force was of

---

[10] Moreover, the facts are unclear as to whether either Officer Godown or Officer Lessig ever put a knee on Plaintiff's back. Plaintiff contends that one of the Officers holding him down, now known to have been Sergeant Lessig and Officer Godown, was kneeling on Plaintiff's back making it difficult for him to breathe. Officer Godown testified that he could not recall whether either he or Lessig ever placed a knee on Plaintiff's back, but stated that at the point that Plaintiff stated that he could not breathe, Officer Godown was kneeling next to Plaintiff's right side and was only restraining Plaintiff with his hands by pressing down on Plaintiff's right shoulder. Godown Tr. 73:8-18. Plaintiff has testified that he could not see the officers on top of him and thus does not know whether Officer Godown had a knee on his back and thus did not controvert Officer Godown's recollection of his position at that time. Shuman Tr. 85:9-14. From the MVR, it is clear that the time from Plaintiff first stating that he could not breathe to Officer Godown clearly standing away from Plaintiff was no more than one and a half minutes. MVR at 1:32:591:34:27. Construing the facts in the light most favorable to Plaintiff therefore, if Officer Godown had placed a knee on Plaintiff's back, it was there for at most one and a half minutes. As indicated above, this Court does not find the dispute of fact concerning the position of the officer's knee, to the extent there is a dispute, material to the question of qualified immunity because the Court's step two analysis is dispositive.

limited duration, lasting only a minute and a half at most. Secondly, upon arriving at the scene, Officer Godown observed Plaintiff moving on the ground while being restrained by Officer Carson. Whether or not Plaintiff was in fact resisting arrest, it was not unreasonable for Officer Godown to use force against Plaintiff until it could be discerned that Plaintiff was not resisting, given that it is undisputed that Plaintiff was moving on the ground while being restrained by Officer Carson. Finally, as was the case for Sergeant Lessig, Officer Godown had been told by Officer Carson that Plaintiff was of unknown identity and intention. Regardless of the truth of Officer Carson's statement, it was not unreasonable for Officer Godown to use limited force based upon the representations of another officer who preceded him on the scene. As was the case for Sergeant Lessig, because Officer Godown cannot be said to have acted in violation of a *clearly established* right, his motion for summary judgment on the basis of qualified immunity will be granted.

### III. NJCRA Claims

The NJCRA was modeled after § 1983, and thus courts in New Jersey have consistently looked at claims under the NJCRA "through the lens of § 1983." *Trafton v. City of Woodbury,* 799 F.Supp.2d 417, 443–44 (D.N.J.2011); *Chapman v. New Jersey,* Civ. No. 08–4130, 2009 WL 2634888, *3 (D.N.J. Aug. 25, 2009) ("Courts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart ...."); *Armstrong v. Sherman,* Civ. No. 09–716, 2010 WL 2483911, *5 (D.N.J. June 4, 2010) ("[T]he New Jersey Civil Rights Act is a kind of analog to section 1983 ...."). Accordingly, Plaintiff's New Jersey State Constitution claims will be interpreted analogously to his § 1983 claims. *Trafton,* 799 F.Supp.2d at 443–44; *see Hedges v. Musco,* 204 F.3d 109, 121 n. 12 (3d Cir.2000) (concluding New Jersey's constitutional provisions concerning search and seizures are interpreted analogously to the Fourth Amendment). The Raritan Defendants' motion for summary judgment on the NJCRA claim

against Officer Carson on the basis of qualified immunity and the merits is thus denied, as explained above. The Raritan Defendants' motion and Officer Godown's motion for summary judgment on the NJCRA claims against Sergeant Lessig and Officer Godown respectively are granted on the basis of qualified immunity.

## IV. *Monell* Liability of the Municipality

In addition to bringing claims against the individual officers, Plaintiff also seeks to impose liability on the Township of Raritan and upon Officer Carson's supervisors. "A municipality cannot be held liable for the unconstitutional acts of its employees on a theory of *respondeat superior. Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014) (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978)).[11] "A plaintiff seeking to hold a municipality liable under section 1983 must demonstrate that the violation of rights was caused by the municipality's policy or custom." *Id.* "Liability is imposed 'when the policy or custom itself violates the Constitution or when the policy or custom, while not unconstitutional itself, is the 'moving force' behind the constitutional tort of one of its employees.'" *Id.* (quoting *Colburn v. Upper Darby Twp.,* 946 F.2d 1017, 1027 (3d Cir. 1991)). "'Policy is made when a decisionmaker possess[ing] final authority to establish a municipal policy with respect to the action issues an official proclamation, policy, or edict.'" *Bocchino v. City of Atl. City*, 179 F.

---

[11] "In *Monell,* the Supreme Court held that a municipality can be found liable under § 1983 only when the municipality itself causes the constitutional violation at issue." *Vargas v. City of Philadelphia*, 783 F.3d 962, 974 (3d Cir. 2015) (citing *City of Canton, Ohio v. Harris,* 489 U.S. 378, 385 (1989)). "In order to impose liability on a local governmental entity for failing to preserve constitutional rights, a plaintiff bringing a § 1983 claim must establish that: (1) she possessed a constitutional right of which she was deprived; (2) the municipality had a policy; (3) the policy 'amount[ed] to deliberate indifference' to the plaintiff's constitutional right; and (4) the policy was the 'moving force behind the constitutional violation.'" *Id.* (quoting *Canton,* 489 U.S. at 389–91). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown,* 520 U.S. 397, 410 (1997)).

Supp. 3d 387 (D.N.J. 2016) (quoting *McTernan v. City of York, PA*, 564 F.3d 636, 658 (3d Cir. 2009)). Conduct is considered a custom "'when, though not authorized by law, such practices of state officials [are] so permanently and well-settled as to virtually constitute law.' " *Id.* "Custom requires proof of knowledge and acquiescence by the decisionmaker." *Id.*

"Where the policy 'concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact.'" *Id.* (quoting *Carter v. City of Phila.,* 181 F.3d 339, 357 (3d Cir. 1999) (quoting *City of Canton, Ohio v. Harris,* 489 U.S. 378, 388 (1989) ("*Canton* ")). "Additionally, 'the identified deficiency in a city's training program must be closely related to the ultimate injury;' or in other words, 'the deficiency in training [must have] actually caused' the constitutional violation." *Id.* (quoting *Canton,* 489 U.S. at 391) (alterations in original).

In the case at bar, the alleged constitutional violation is Officer Carson's use of excessive force in effecting Plaintiff's arrest for a disorderly persons offense, including actions taken in restraining and handcuffing Plaintiff. Plaintiff argues that Raritan Township's allegedly inadequate investigation of complaints against Officer Carson, failure to enforce its own policies, and failure to discipline or retrain Officer Carson in response to evidence of Officer Carson's inability to conduct himself in a manner consistent with an officer in his interactions with the public constitute a custom of tacit approval of Officer Carson's conduct. Plaintiff alleges that Officer Carson's conduct put his supervisors on notice of the need for discipline or retraining, and that their failure to act was causally connected to Plaintiff's injuries.

At the outset, it is important for the Court to disentangle Plaintiff's arguments so that the proper standard can be applied to each of what are truly three distinct theories of *Monell*

liability.[12]  Firstly, Plaintiff's briefing can be read to argue that Raritan Township failed to train Officer Carson, such that it can be held liable for the violation of Plaintiff's rights should officer Carson be found to have exercised excessive force. There is a well-developed body of law in this Circuit establishing the parameters of a "failure to train" case, which Plaintiff has failed to meet. Secondly, Plaintiff's briefing can be read to argue that the custom of the Raritan Township police department to conduct inadequate internal affairs investigations renders Raritan Township liable for Officer Carson's conduct. Again, under the clearly established law in the "custom" cases, Plaintiff has failed to make the required showing. In both scenarios, the major obstacle is that Plaintiff has failed to show a department-wide policy of inadequate training, or custom of inadequate investigation sufficient to bind the Township under *Monell*. Finally, therefore, what appears to be Plaintiff's most likely argument is that the evidence of inadequate training *as to Officer Carson* and of failure to adequately investigate internal affairs complaints *as to Officer Carson* may be used to support a finding that Officer Carson's superior officers failed to adequately supervise him, thus rendering them individually liable under Section 1983 for his conduct. The Court will address this argument separately under the standards governing supervisory liability.

## A.  Failure to Train

### 1.  Deliberate Indifference

---

[12] Although the Plaintiff in this case is represented by counsel, the Court has nevertheless undertaken in the interest of completeness to evaluate Plaintiff's claims under the raised legal theories, even where not thoroughly evaluated and supported in briefing. Still, there are limits to the Court's willingness to plumb the depths of the record for support without the parties' guidance. After all, as the Third Circuit has observed, "'[j]udges are not like pigs, hunting for truffles buried in' the record." *Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 n.8 (3d Cir. 2006).

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 223 (3d Cir. 2014) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown,* 520 U.S. 397, 410 (1997)). "Ordinarily, '[a] pattern of similar constitutional violations by untrained employees' is necessary 'to demonstrate deliberate indifference for purposes of failure to train.'" *Id.* (quoting *Connick v. Thompson,* —— U.S. ——, ——, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011)). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* "A pattern of violations puts municipal decisionmakers on notice that a new program is necessary, and '[t]heir continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability.'" *Id.* (quoting *Bryan Cnty.,* 520 U.S. at 407).

Here, Plaintiff alleges that Officer Carson's training was deficient in failing to address his demonstrated problems in handling and de-escalating interactions with the public. Plaintiff has introduced evidence of a pattern of incidents based upon Officer Carson's employee record, including six internal affairs investigations, and Officer Carson's own use of force reports, filed as a matter of department policy following any incident in which force is used, even where no complaint is filed. Plaintiff's evidence spans the periods both before and after the August 2012 incident, and the Court will address each period separately.

### (i)    Pre-Incident Evidence

The first four internal affairs investigations identified by Plaintiff took place before the August 2012 incident which is the subject of Plaintiff's excessive force claim. The first three

investigations dealt with improper conduct by Officer Carson not involving physical force, and took place between six and eleven years prior to the incident with Plaintiff. The Raritan Defendants argue in reply that these incidents are not relevant to the Court's *Monell* considerations. Being mindful that these incidents did not directly deal with excessive force, the Court accordingly views them as relevant only to the municipal and supervisory defendants' knowledge of Officer Carson's troubled history of interactions with members of the public, not any propensity on Officer Carson's part to act with excessive force. The fourth complaint, however, is clearly relevant on all counts as dealing with an alleged use of excessive force in the context of a motor vehicle stop.

In 2001, Officer Carson was subject to an internal affairs investigation for inappropriate contact with a sixteen year old girl. The complaint was substantiated, and Officer Carson was found to have communicated with the girl over the internet and to have visited her on one occasion at her place of employment. The investigation concluded that Officer Carson had engaged in "conduct unbecoming an officer." Officer Carson was disciplined by having to forfeit three days of vacation and was ordered to undergo a psychological evaluation. Carson IA-01002-D.

Also in 2001, Officer Carson was subject to an internal affairs investigation for inappropriately entrusting minor children to the care of the children's neighbor, after the children were found home alone. A worker at the New Jersey Department of Youth and Family Services complained that the agency had not been properly notified by Officer Carson and the complaint was substantiated. Officer Carson was ordered to receive "departmental counseling" as a consequence. Carson IA-01-0004-D.

In 2006 Officer Carson was subject to an internal affairs investigation for illegally searching a home after gaining improper consent from a minor. The complaint was substantiated and Officer Carson was disciplined by forfeiting one vacation day. Carson IA-06-006-D.

In July of 2010, just over two years prior to the incident in question, Officer Carson was subject to an internal affairs investigation arising from the complaint of a motorist during a traffic stop. The motorist alleged that, during a routine traffic stop, Officer Carson utilized a wrist lock technique to force the motorist's chest and head forwarded while he was seated in his vehicle. The MVR footage of the stop indicated that Officer Carson performed the wrist lock, the motorist complained of a burning sensation in his shoulder, likely aggravated by the motorist's arthritis, and Officer Carson released him. Although the MVR did not appear to show the motorist in any continuing pain after being released, the motorist filed a complaint of excessive force against Officer Carson. Defendant Lieutenant Buck conducted the investigation into that stop. As part of the investigation, Lieutenant Buck reviewed the MVR footage and interviewed Officer Carson. Neither the complainant, nor the passenger of the vehicle, who was also present during the stop were interviewed. Based on Lieutenant Buck's review, the complaint was not substantiated and the matter was closed with a disposition of "exonerated, proper conduct & policy."[13]

In addition to the records of the internal affairs investigations, Plaintiff also offers the fact that Officer Carson filed twelve use of force reports between 2008 and August 2012. Of these, six, or a full half, were filed in the one year period immediately preceding the incident. Carson

---

[13] It should be noted that, although Plaintiff argues that Lieutenant Buck's investigation was inadequate, it is not the province of this Court to determine here whether the 2010 internal affairs investigation was mistaken as to Officer Carson's use of force. Instead, the Court looks to this record as indicative of the manner in which internal affairs investigated Officer Carson's conduct.

Use of Force Reports, 2008-2012. Plaintiff's expert, Joseph Blaettler, opined in his report that some of the techniques identified in the reports, described as a "leg sweep" and a "body drag," as well as the number of reports over a relatively short time frame should have alerted Officer Carson's supervisors of the need to further evaluate and retrain Carson. Blaettler Report, 33. In particular, Plaintiff's expert identified the "leg sweep," one of the techniques also used on Plaintiff during the August 2012 incident, as "extremely dangerous." *Id.* at 15. Plaintiff further represents that his counsel's review of the use of force reports for the officers of the Raritan Police Department reveals that the "leg sweep" and "body drag" techniques appearing in Officer Carson's reports do not appear in the reports of any other officers in the four year period immediately predating the incident. The Raritan Defendants respond that the reports filed by Officer Carson evidence only that he complied with the Attorney General Guidelines on the Use of Force, which require officers to complete such reports. Without addressing the specific content of the six reports filed in the year prior to the August 2012 incident, the Raritan Defendants argue that nothing in the reports gave the supervisory defendants notice that Officer Carson was a bad actor.

**(ii)      Post-Incident Evidence**

In addition to the forgoing, Plaintiff also relies upon the internal investigation into Officer Carson arising from Plaintiff's own complaint, and another internal affairs investigation into Officer Carson based on a complaint of excessive force that was lodged at some point in 2013.[14] As an initial matter, both of these internal affairs investigations took place *after* the alleged incident with Plaintiff. This does not, as the Raritan Defendants argue in reply without legal

---

[14] Plaintiff represents that, although Officer Carson admitted to the existence of such a complaint in his deposition, Plaintiff was not able to obtain the records of the investigation due to the close of discovery.

support, necessarily preclude their consideration, but rather merely limits their evidentiary value. A complaint of excessive force which "occurred after [plaintiff's] experience, may have evidentiary value for a jury's consideration whether the [municipality] and policymakers had a pattern of tacitly approving the use of excessive force." *Beck v. City of Pittsburgh*, 89 F.3d 966, 972 (3d Cir. 1996). *See also Groark v. Timek*, 989 F. Supp. 2d 378, 397–98 (D.N.J. 2013) ("[defendant municipality] is correct that evidence of subsequent constitutional violations cannot be used to show its knowledge of an unconstitutional custom or policy at the time of plaintiff's . . . incident. Subsequent incidents, however, may be relevant to show a continuous pattern that supports a finding of an accepted custom or policy. They are also relevant to issues of pattern, intent, and absence of mistake.") (citations omitted). In this case therefore, evidence of the post-incident internal affairs investigations is not relevant to the municipal and supervisory defendants' knowledge of Officer Carson's propensity for the use of excessive force in the period leading up to the August 2012 incident. Although this evidence may be used, as in fact Plaintiff offers it, to establish a pattern of inadequate investigation by the Raritan Police Department, in view of the absence of other substantial evidence of the type used to prove claims of a custom of inadequate investigation, the Court finds this record alone unpersuasive.

### (iii)    Internal Affairs Investigations

The internal affairs investigation into Plaintiff's complaint was conducted by Lieutenant Kevin Donovan. As part of the investigation, Lieutenant Donovan reviewed the MVR footage, spoke to plaintiff on the phone on one occasion at the time that plaintiff initially requested the internal affairs complaint form, reviewed plaintiff's written statement, reviewed Officer Carson's police report, and spoke to a detective at the Hunterdon County Prosecutor's Office. Lt. Donovan Report, dated 10/12/12; Donovan Tr. 97:17-98:2. Lieutenant Donovan did not interview Officer Carson, Sergeant Lessig, Alexa Shuman, or Officer Godown, and stated in his deposition that he

did not believe it was necessary to do so. Donovan Tr. 100; 104-105; 94:4-94:7; 95:24-96:3; 96:6-96:16. Plaintiff argues that Lieutenant Donovan's failure to interview Officer Carson was a breach of the Raritan Police Department's internal affairs policy, which states that investigations into serious complaints, including complaints of excessive force, should involve a scheduled interview with the accused officer. Raritan Township Police Department Internal Affairs/Disciplinary Process Policy, at 8.[15] Lieutenant Donovan, and Police Chief Tabasko, did, however seek a second opinion on the MVR footage, and sent it to the Hunterdon County Prosecutor's Office for review. Donovan Tr. 78, 85; Tabasko Tr. 99. A detective working for the Prosecutor's Office indicated that he had reviewed the MVR and would not be opening a criminal investigation into Officer Carson and that an assistant prosecutor had reviewed the "facts of the case" and determined that there was no excessive force under the circumstances. Shuman Internal Affairs Investigation Report, RT-123-124.

Finally, sometime in 2013, the year following the incident in this case, Officer Carson was again subject to an internal affairs investigation arising from a complaint regarding the use of force during a motor vehicle stop. Carson Tr. 51; Carson Answers to Supplemental Interrogatories, March 21, 2016, at ¶ 3. Plaintiff does not have a copy of the record for this complaint or its disposition and none has been provided to the Court. As a result of the investigation, however, Officer Carson was required to enroll in an "Interpersonal Communications" class at the Somerset County Police Department on December 3, 2014. *Id.* at ¶¶ 1, 4. According to the Somerset County Policy Academy's training catalog, the one-day

---

[15] The Policy Plaintiff cites was effective November 14, 2012 – after the incident in question. Plaintiff relies on the policy as the only one provided by the defense and upon Police Chief Tabasko's representation that there were likely no changes in the policy between August 2012 and November 14, 2012. Tabakso Tr. 70-72.

program is designed with the goal that "[t]hrough this training, the officer will be able to potentially defuse those situations where the use of force might be the only anticipated outcome," and "to defuse not only potentially dangerous situation[s], but also every day occurrences." Blaettler Report, at 19-20.[16]

### (iv)    Evidence of Training

Although Plaintiff has introduced evidence that Officer Carson was not enrolled in specific interpersonal communication training until after the August 2012 incident, the record reflects that Officer Carson underwent significant, regular training in the use of force. Turning first to Officer Carson's testimony, Plaintiff relies upon his expert's interpretation of Officer Carson's deposition testimony to assert that "other than what he learned in the academy (16 years ago) and a few classes on how to handcuff someone, the department offers no training" on how to physically conduct an arrest. [Plaintiff's brief 38; Blaetter Report 21]. This is not an accurate reflection of Officer Carson's testimony. Looking to the actual text of the passages upon which Plaintiff and Plaintiff's expert rely, it is clear that Officer Carson did regularly receive training on the use of force and proper handcuffing techniques.

> Q: . . . [B]ased on your training record, would it be fair to say you have not had any –
> other than the police academy, you haven't had any training on arrest procedures?
>
> A: I'm not comfortable with that. As I stated, on some of the use of force days, we did
> some handcuffing techniques.[17] We've done some classroom discussion on it. I haven't
> gone to any specific course since the academy that deals with that. No.

---

[16] In his opposition papers, Plaintiff requests that additional discovery be permitted as to all history, files, and complaints regarding Officer Carson, including those not previously produced as taking place after the 2012 incident.

[17] Officer Carson had testified earlier in his deposition that he attended courses twice a year (the parties use the word biannual to mean semiannual) at which approximately two hours was devoted to training in the appropriate use of force, including in-classroom training, the review of videos of police encounters, interactive exercises, and discussions. The training may also have involved discussions about the appropriate use of force with assistant prosecutors, but Officer Carson could not recall whether that practice began before or after the incident in this case. 85:6-19.

> Q: Okay. So you haven't had any training with respect to, you know, putting a handcuff on somebody, you know, when they don't know it, or, you know what types of physical force you can use? You haven't had any particular in-service training on that since the academy?
>
> A: No. Use of force training twice a year they discuss when you can use of force. What type of force you can use. What circumstance it's appropriate. When it would not be appropriate.
>
> Officer Carson even stated that he had received an advanced course in high risk motor

vehicle stops.

> Q: Have you ever had any specific training in terms of your training record there having to do with a motor vehicle stop?
> . . .
>
> A: Yes.
>
> Q: What's your training on that?
>
> A: . . . High Performance Patrol Tactics in 2002.
>
> Q: Okay. What was that about?
>
> A: That dealt with kind of - - it was a more advanced course. I think you had to have two or three years of the road experience before you could go to that course. It was about high risk motor vehicle stops That type of thing. Felony stops. What most people call felony stops.

Carson Tr. 144:18-146:10. While the motor vehicle stop in this case was obviously not of a high

risk variety, it is simply inaccurate to state that Officer Carson did not receive training on the use

of force generally, the use of force in applying handcuffs, of the use of force in motor vehicle

stops on the basis of Officer Carson's testimony.

Sergeant Lessig's testimony similarly does not support Plaintiff's allegation that there

was a failure to offer training in the use of force. Sergeant Lessig too testified that twice a year

the officers of the Raritan Township Police Department would engage in a two to three hour

training in the use of force. Lessig Tr. at 317:4-317:8. Sergeant Lessig testified that the course

consisted of a policy review and discussion of any current events that had arisen in the

department. *Id.* at 317:19-21. Sergeant Lessig confirmed that there was a practicum or clinical

portion of the training session, *id.* at 318:2, that there was a test, *id.* at 318:4, and that there was a

question and answer session concerning the use of force, *id.* at 318:11.

       **(v)**      **Analysis**

Reviewing the record before it in the light most favorable to Plaintiff, the Court

concludes that Plaintiff has failed to make the threshold showing that the training program of

Raritan Township was deficient in some respect regarding the appropriate use of force or

interactions with the public. Prior to the August 2012 incident, Officer Carson received training

twice each year on the appropriate use of force in making arrests, which training included review

of the Township's policies, discussion of recent related events experienced by the department, a

practicum, a test, and a question and answer session. In response to these undisputed facts,

Plaintiff has argued only that a more specific additional training in interpersonal communication

would have been appropriate in Officer Carson's case, due to his disciplinary record, to drive

home the point that the use of alternatives to physical force are warranted in many interactions

with the public. Even assuming that the one excessive force complaint filed against Officer

Carson prior to the 2012 incident, of which Officer Carson was exonerated, coupled with the

admittedly high number of use of force reports filed in the one year period leading up to the

incident, were sufficient to place Officer Carson's superiors on notice of the potential for

misconduct, these facts only go to establish the possibility that Officer Carson was not

complying with his training, or that the Township's training program had proved ineffective in a

particular case. This is simply not sufficient to establish a deficiency to which the Township

could be deliberately indifferent. "[T]he flaw must be in the training program itself; isolated

errors in its execution will not suffice. Liability will not arise merely because an otherwise

acceptable training program has been negligently administered." *Benhaim v. Borough of Highland Park*, 79 F. Supp. 3d 513, 523 (D.N.J. 2015) (citing *Canton*, 489 U.S. at 391). Plaintiff was required to provide evidence of the existing training program and identify the omission in it. Here, Plaintiff merely proposes a training program that would have been superior or preferable. *See Noble v. City of Camden*, 112 F. Supp. 3d 208, 225 (D.N.J. 2015) (summary judgment warranted where plaintiff "makes no mention of what training or supervision was even provided by the Police Department on arrests and use of force, or the substance or frequency of the training.").

**2. Causation**

"In addition to deliberate indifference, '*City of Canton* teaches that to sustain a claim based on a failure to train theory, 'the identified deficiency in [the] training program must be closely related to the ultimate [constitutional] injury.'" *Colburn,* 946 F.2d at 1028 (alterations in original) (quoting *Canton,* 489 U.S. at 391, 109 S.Ct. 1197). The failure to train must have "a causal nexus with [the plaintiff's] injury." *Id.* at 1030. In analyzing causation, "the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *Canton,* 489 U.S. at 390, 109 S.Ct. 1197. Liability cannot rest only on a showing that the employees "could have been better trained or that additional training was available that would have reduced the overall risk of constitutional injury." *Colburn,* 946 F.2d at 1029–30. Rather, the causation inquiry focuses on whether "the injury [could] have been avoided had the employee been trained under a program that was not deficient in the identified respect." *Canton,* 489 U.S. at 391. *See Thomas v. Cumberland Cty.*, 749 F.3d 217, 226 (3d Cir. 2014).

Again, as in *Colburn*, the Plaintiff in this case alleges that Officer Carson could have been "better trained" and that there was an "additional training" available on interpersonal communication that would have reduced the risk that Officer Carson would exercise force during

47

traffic stops in the manner that harmed Plaintiff. This fails to meet the causation standard, because Plaintiff addresses only what more could have been done to improve the Township's training program, not what was missing in the Township's existing program that actually caused Plaintiff's injuries.

**B.  Custom**

Concerning Plaintiff's allegations relating to the custom of the Raritan Township Police Department to inadequately investigate Officer Carson's interactions with the public and use of force, the Court finds that, although Plaintiff has provided expert analysis and supporting evidence of three internal affairs investigations into Officer Carson in three years (2010, 2012, and 2013), and the Department's failure to evaluate Officer Carson's methods after a number of use of force reports (six between August 2011 and August 2012), some of which reported unusual and potentially dangerous methods that were in fact employed against Plaintiff (the "leg sweep"), Plaintiff's showing falls short of establishing that a reasonable jury could find that Raritan Township's conduct established a custom of tacitly endorsing Officer Carson's behavior. As an initial matter, plaintiffs who have survived summary judgment on custom cases predicated on the inadequate investigation of excessive force complaints have uniformly presented expert, statistical evidence of a pattern of behavior by the department. *See Noble v. City of Camden*, 112 F. Supp. 3d 208, 222 (D.N.J. 2015) (plaintiff entitled to survive summary judgment where plaintiff's expert introduced evidence of 19 excessive force cases against the two defendant officers, of which four were still pending investigation after more than three years and that only two of 485 complaints of excessive force were sustained by the Camden Police Department over six years); *Merman v. City of Camden*, 824 F. Supp. 2d 581, 590 (D.N.J. 2010) (plaintiff entitled to survive summary judgment where Plaintiff introduced internal affairs statistical summaries showing 470 excessive force complaints over a six year period, with the number of complaints

increasing over time and provided several examples of complaints where discipline would have been warranted but was not provided); *Beck v. City of Pittsburgh*, 89 F.3d 966, 975 (3d Cir. 1996) (plaintiff entitled to reversal of judgment as a matter of law where plaintiff's expert introduced evidence of five excessive force complaints against the defendant officer over fewer than five years; that of 34 complaints of police officer violence in a given year, none had resulted in disciplinary action; and that the Department had taken no action in response to an 100% increase in claims of excessive force over a three year period). Plaintiff has not provided any comparably systematic review of the Raritan Township Police Department's handling of excessive force complaints. While there is no magic number of incidents involving excessive force that a plaintiff is required to show in order to establish the custom of a municipality, the limited number of complaints – just three, only one of which preceded the incident in question – in this case fall short of what is deemed acceptable in custom cases.

Even if Plaintiff had provided such evidence, "[i]solated and without further context, however, statistical evidence alone may not justify a jury's finding that a municipal policy or custom authorizes or condones the unconstitutional acts of police officers. . . . Rather than reciting a number of complaints or offenses, a Plaintiff must show why those prior incidents deserved discipline and how the misconduct in those situations was similar to the present one." *Merman v. City of Camden*, 824 F. Supp. 2d 581, 591 (D.N.J. 2010) (citations omitted). This is often done by focusing on the defendant officer's own prior history of complaints. *Id.* Although Plaintiff does introduce one prior and one subsequent excessive force complaint against Officer Carson, other than alleging that the investigation of each was deficient, Plaintiff does not provide the Court with any basis to presume that those complaints in fact involved any misconduct that was not appropriately addressed.

On the record before the Court, no reasonable jury could conclude that there was a custom of inadequate investigation of excessive force complaints in the Raritan Township Police Department so well established as to operate with the force of an official policy.[18]

## V. Supervisory Liability

Here, reading Plaintiff's very limited briefing on this issue expansively, Plaintiff alleges that Chief Tabasko, Lieutenant Buck, Lieutenant Donovan, and Sergeant Lessig failed to adequately supervise Officer Carson, giving rise to Plaintiff's injury. Although briefed in conjunction with Plaintiff's *Monell* claims against the municipality, Plaintiff's claims that Officer Carson's superiors failed to adequately supervise him are properly brought as individual Section 1983 actions against the supervisors in their personal capacity. There are two theories of supervisory liability under which a plaintiff can sue a municipal defendant in a personal capacity action. *See A.M. v. Luzerne County Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d. Cir. 2004). Under the first theory, defendants can be sued as policy-makers "if it is shown that such defendants, 'with deliberate indifference to the consequences, established and maintained a policy, custom, or practice which directly caused [the] constitutional harm.'" *Id.* (citing *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989).

Plaintiff cannot support a policy-maker argument against any of the Defendants in this case, because, as the Court observed above, Plaintiff has not alleged a policy of the inadequate investigation of complaints of excessive force or inadequate supervision of officers, and Plaintiff

---

[18] Although *Monell* liability may be shown on the basis of a single incident, Plaintiff has not even attempted to make the required showing for single-incident liability in this case. *See, e.g., Thomas v. Cumberland Cty.*, 749 F.3d 217, 223 (3d Cir. 2014) ("Because 'city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons,' if the city arms the officers with firearms, 'the need to train officers in the constitutional limitations on the use of deadly force' is 'so obvious' that a failure to provide such training could provide a basis for single-incident municipal liability.").

has failed to identify sufficient evidence in the record to establish an equivalent custom. Additionally, Plaintiff has not alleged that any of the supervisory defendants are decisionmakers with final authority to determine such policies, although the Court observes, without deciding that Chief Tabasko may be. *McTernan v. City of York, PA*, 564 F.3d 636, 658 (3d Cir. 2009).

The second theory provides for personal liability if plaintiffs can show that a supervisor "participated in violating their rights, or that he directed others to violate them, or that he ... had knowledge of and acquiesced in his subordinates' violations." *Id.* (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1190-91 (3d Cir. 1995); *see also Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990)). Plaintiff alleges that Sergeant Lessig participated in the violation of his Fourth Amendment rights. Plaintiff does not allege that any of the other supervisory defendants participated in Officer Carson's conduct or directed Officer Carson to use excessive force against Plaintiff.

To impose liability on a supervisory official under the only remaining basis, on the grounds of knowledge and acquiescence, there must be "both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's assertion could be found to have communicated a message of approval to the offending subordinate." *Colburn v. Upper Darby Twp.*, 838 F.2d 663, 673 (3d Cir. 1988). Allegations of actual knowledge and acquiescence must be made with particularity. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). There is no liability for personal capacity actions based only on a theory of *respondeat superior*. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). The Court applies these standards to the claims against each of the supervisory defendants in turn.

**A. Lieutenant Donovan**

Lieutenant Donovan is not a named defendant in this action and thus no claim against him is appropriate.

**B. Lieutenant Buck**

As a threshold matter, Plaintiff has failed to allege any facts that show that Lieutenant Buck supervised Officer Carson. Lieutenant Buck is only alleged to have conducted the internal affairs investigation into the first complaint in the record of excessive force lodged against Officer Carson, which was made in 2010. The record indicates that Officer Carson filed five use of force reports in the two year period prior to that incident, but, unlike the case of the six reports filed in the one year period preceding Plaintiff's 2012 complaint, Plaintiff's expert does not provide an opinion as to the appropriateness of these reports or whether they should have provided notice of a problem to Officer Carson's superiors. Exhibit CC. Given the evidence in the record, therefore, even assuming Lieutenant Buck is Officer Carson's supervisor, Plaintiff has failed to show any contemporaneous knowledge of the incident or knowledge of a prior pattern of similar incidents that would allow for supervisory liability.

**C.  Sergeant Lessig**

The Court has already ruled that Sergeant Lessig is entitled to qualified immunity for his participation in the August 2012 incident in which Plaintiff was injured. Qualified immunity is also a defense to supervisory liability, and so, to the extent that Plaintiff's supervisory liability claim against sergeant Lessig is based on his conduct on the night of the incident, it is dismissed. *See, e.g., Argueta v. U.S. Immigration & Customs Enf't*, 643 F.3d 60, 68 (3d Cir. 2011). Plaintiff also alleges, however, that Sergeant Lessig was Officer Carson's direct supervisor, was responsible for reviewing all of Officer Carson's use of force forms, and was the use of force instructor during at least some of Officer Carson's use of force trainings. Lessig Tr. 404. Plaintiff argues that, separate and apart from Sergeant Lessig's participation in the August 2012 incident,

he may be held liable for his knowledge and acquiescence in Officer Carson's prior course of conduct.

The Court observes that Plaintiff has alleged that Sergeant Lessig had actual knowledge of the contents of Officer Carson's use of force reports, and has provided evidence in the form of Plaintiff's expert's opinion that those reports contained descriptions of techniques that were "extremely dangerous." The missing element in Plaintiff's case to establish Sergeant Lessig's knowledge of prior *similar incidents*, however, is some evidence indicating that the exercises of force identified in Officer Carson's use of force forms was in some way excessive or inappropriate, in addition to being merely dangerous. Indeed, these incidents may have been justified under the circumstances. Regardless, the Court cannot conclude from Plaintiff's expert's opinion alone, which was based on the use of force forms which do not provide significant details of the factual circumstances in which force was used, that Sergeant Lessig had actual knowledge of Officer Carson's tendency to exercise excessive force. In the absence of additional evidence, a finding of supervisory liability is inappropriate.

### D.  Police Chief Tabasko

Lastly, as stated above, there is no liability for personal capacity actions based only on a theory of *respondeat superior*. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). The bulk of Plaintiff's allegations against Chief Tabasko sound in *respondeat superior*, namely that as Police Chief who is generally charged with the supervision of internal affairs investigations and of all officers, he was charged with knowledge of Officer Carson's disciplinary file. Such allegations are insufficient to impose supervisory liability. The sole evidence in the record, identified by Plaintiff as demonstrating Chief Tabasko's *actual knowledge* of a prior pattern of similar incidents comes from Chief Tabasko's involvement in the internal affairs investigation into Plaintiff's own complaint of excessive force against Officer Carson in 2012.

Counterstatement of Fact 132-155. The Court finds this showing insufficient to establish supervisory liability, because, even if the Court were to agree with Plaintiff that Officer Carson's demonstrated troubled history in dealing with the public evidenced a tendency to use excessive force, the record does not support that Chief Tabasko became actually aware of these prior similar incidents until *after* Plaintiff suffered his injuries. In the absence of a showing of prior knowledge, a finding of supervisory liability is inappropriate.

## VI. Emotional Distress

Having resolved Plaintiff's constitutional claims, the Court last addresses the Raritan Defendants' motion to dismiss Plaintiff's claim for intentional infliction of emotional distress. "To establish a claim for intentional infliction of emotional distress ("IIED"), [plaintiff] must plead and prove four elements: (1) defendants acted intentionally or recklessly, both in doing the act and producing the emotional distress; (2) defendants' conduct was outrageous and extreme, so as to go beyond all bounds of decency and be utterly intolerable in a civilized community; (3) defendants' actions were the proximate cause of the plaintiff's emotional distress; and (4) the distress suffered was so severe that no reasonable person could be expected to endure it." *Kounelis v. Sherrer*, 529 F. Supp. 2d 503, 532 (D.N.J. 2008) (citing *Buckley v. Trenton Sav. Fund Soc.,* 111 N.J. 355, 366, 544 A.2d 857 (1988)). "The severity of the emotional distress raises questions of both law and fact. Thus, the court decides whether as a matter of law such emotional distress can be found, and the jury decides whether it has in fact been proved." *Buckley v. Trenton Saving Fund Soc.*, 111 N.J. 355, 367, 544 A.2d 857, 864 (1988).

The Raritan Defendants move to dismiss Plaintiff's claims on the basis that Plaintiff has failed to provide any objective evidence of emotional distress and that Plaintiff has failed to provide expert testimony in support of his claims as required under New Jersey law. Plaintiff

counters that cases alleging police use of excessive force generally may satisfy the requirements of an IIED claim and that expert testimony is not required to prove an IIED claim.

The Court agrees with Plaintiff that expert testimony is not required in all IIED cases. "[N]either medical treatment, nor expert testimony is necessary in order for a plaintiff to prevail on an IIED claim." *Kounelis v. Sherrer*, 529 F. Supp. 2d 503, 533 (D.N.J. 2008) (citing *Bolden v. SEPTA,* 21 F.3d 29, 34 (3d Cir.1994) (holding that expert testimony is not required to corroborate a claim for emotional distress)). Plaintiff has, however, failed to cite to any objective evidence in the record in response to Defendants' motion supporting the existence of emotional distress of the requisite severity to be actionable under New Jersey law.

The Third Circuit has "held that, where the party opposing a motion for summary judgment bears the ultimate burden of proof, the moving party may discharge its initial burden of showing that there is no genuine issue of material fact by ''showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.' If the moving party has satisfied its initial burden, the nonmoving party must, in their opposition to the motion, identify evidence of record that creates a genuine issue of material fact." *Player v. Motiva Enterprises, LLC*, 240 F. App'x 513, 522 n.4 (3d Cir. 2007) (quoting *UPMC Health Sys. v. Metro. Life Ins. Co.,* 391 F.3d 497, 502 (3d Cir. 2004)) (citing *Childers v. Joseph,* 842 F.2d 689, 694–95 (3d Cir. 1988)).

Construing the facts in the light most favorable to Plaintiff, Plaintiff has provided evidence that when the Defendant Officers offered to take him to the hospital, he initially refused because he was afraid of them and did not know what else might happen to him while in their presence. Shuman Tr. 74:9-74:25. Plaintiff also reported that for a period after the incident, he had a fear of law enforcement, and although it generally has abated, he still has feelings of panic

when passing through the jurisdiction of the officers involved in the incident. *Id.* at

131:6132:15.[19]

In *Buckley*, the seminal case on the infliction of emotional distress under New Jersey law,

the New Jersey Supreme Court found plaintiff's evidence "insufficient as a matter of law to

support a finding that the mental distress was so severe that no reasonable man could be expected

to endure it," where plaintiff's "complaints amount to nothing more than aggravation,

embarrassment, an unspecified number of headaches, and loss of sleep." 111 N.J. at 368. The

Court was particularly persuaded by the fact that the plaintiff had not shown that his distress was

prolonged ad did "not claim any interference with his every day routine as a result of his mental

distress." *Id.* at 369. Plaintiff's allegations of fear in this case are comparable to those of

aggravation in *Buckley*. Plaintiff stated in his deposition that he did not have a fear of law

enforcement generally, but only of specific officers. Shuman Tr. 131:6-132:7. He stated that

much of his fear had abated since the incident. *Id.* He stated that he still feels panic when he sees

police cars in Flemington specifically, but stated that no Flemington police officers had come

near him or his family since the incident. *Id.* He also specifically stated that his fear was "not

---

[19] Q: Do you have fears of law enforcement?
A: Only specific officers.
Q: . . . [W]e saw all those police cars . . . . That didn't bother you?
A: Not now. It did at the beginning. I had very strong fears and I'm glad to say they have abated.
. . .
Q: When you're driving through Flemington and you see a police car, what happens?
A: I panic.
Q: Describe what you mean by panic.
A: I just get real tense and scared and I'm checking to see if they are turning around, following me, if they are doing anything. Gratefully since the incident, they've not come near any of us, but it doesn't mean that I'm not afraid.
Q: I'm trying to find out what this level of panic is.
A: It's there and it's real. It's not debilitating, but it's real panic.
Shuman Tr. 131:6-132:7.

debilitating." *Id.* In short, Plaintiff introduced no evidence of the "severe" distress required under New Jersey law. *Id.*

Without any identified evidence of severe emotional distress in support of Plaintiff's claim, this Court will grant summary judgment to the Raritan Defendants. *See, e.g. Ribot v. Camacho*, No. CIV.A. 09-5888 JAP, 2012 WL 2401983, at *6 (D.N.J. June 25, 2012) (granting summary judgment on plaintiffs' intentional infliction of emotional distress claim where plaintiffs "do not identify what specific factual disputes preclude summary judgment or cite to any record evidence or case law in support of their claims.").[20]

**CONCLUSION**

Therefore, the Court grants in part and denies in part the motion of the Raritan Defendants and grants the motion of Officer Godown. Plaintiff's § 1983 and NJCRA claims against Sergeant Lessig and Officer Godown are dismissed as barred by qualified immunity. Plaintiff's § 1983 and NJCRA claims on the basis of municipal liability against Raritan Township are dismissed as barred by the Supreme Court's decision in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Plaintiff's § 1983 and NJCRA claims on the basis of supervisory liability against Police Chief Tabasko, Lieutenant Buck, and Sergeant Lessig are dismissed. The Raritan Defendants' motion for summary judgment on Plaintiff's § 1983 and NJCRA claims as raised against Officer Carson is denied. The Raritan Defendants' motion for summary judgment on Plaintiff's New Jersey common law claim for intentional infliction of emotional distress is granted. Additionally, by consent of the parties, all claims against the Raritan Township Police

---

[20] The Court notes that Plaintiff's briefing does not cite any evidence in support of its emotional distress claim. The Court gleaned any alleged supporting evidence from the statements of facts and its own review of the record.

Department, and any punitive damages claim against Raritan Township, are dismissed with

prejudice.

      Order to follow.


Dated: _____11/30/2016_____                          _____/s/ Freda L. Wolfson_____
                                            The Honorable Freda L. Wolfson
                                            United States District Judge